**Opinion issued January 26, 2016**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-15-00184-CR

————————————

## JOVANTE CHARLES BANKS, Appellant

## V.

## THE STATE OF TEXAS, Appellee

On Appeal from the 180th District Court
Harris County, Texas
Trial Court Case No. 1370633

## MEMORANDUM OPINION

Appellant, Jovante Charles Banks, challenges the trial court's judgment adjudicating him guilty of the offense of aggravated sexual assault of a child[1] and

---

[1] *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(iii), (2)(B) (Vernon Supp. 2015).

sentencing him to 14 years in prison. In one issue, Appellant asserts that the trial court abused its discretion in granting the State's motion to adjudicate.

We affirm.

## Background

Appellant was placed on eight years' deferred adjudication community supervision after pleading guilty to the offense of aggravated sexual assault of a child. The conditions of his community supervision required Appellant (1) to report to his community supervision officer on the scheduled dates; (2) not to travel outside Harris County, unless permitted by his community supervision officer; (3) to comply with sex offender registration requirements; (4) to participate in sex offender treatment; (5) not to reside within a 1,000 feet of a place where children commonly gather; (6) to display a sign on the exterior door of his home warning that that children were not allowed to enter; and (7) not to access the Internet.

On November 26, 2013, the State filed its motion to adjudicate, alleging that Appellant had violated the foregoing conditions. The trial court conducted an evidentiary hearing on the motion. Appellant did not deny that he had violated the conditions of community supervision as alleged by the State. Instead, Appellant asserted that, due to his mental deficiencies, he had not understood the conditions of his community supervision or the consequences of violating them.

2

At the hearing, the State called court liaison officer Jackie Scurry, who testified that she had met with Appellant on July 9, 2013, the first day of his community supervision. She stated she had reviewed the conditions of Appellant's community supervision with him, and Appellant had signed the conditions in her presence.

On cross-examination, Scurry remembered that, when she explained the conditions, Appellant had not been "serious enough" and had been "just playing and laughing." After she explained the conditions to him, Scurry told Appellant that he would begin reporting to a community supervision officer at a satellite office. The written terms and conditions of community supervision, signed by Appellant and Scurry, were admitted into evidence at the hearing.

Scurry also testified that, after the State filed the motion to adjudicate, Appellant was arrested in New Orleans. Scurry confirmed that Appellant had never received permission to leave Harris County, as required by the terms of his community supervision.

Janet Ford was Appellant's assigned community supervision officer. She testified that, when she initially met with him, she read and explained each condition of community supervision to Appellant. At that time, Appellant indicated to Ford that he understood the conditions. One of the conditions that

Ford explained to Appellant was his duty to report to her. Appellant indicated that he understood that condition.

Appellant reported to Ford on his first required report date of July 11, 2013. Appellant did not, however, report on July 18, as required. Ford sent a failure-to-report letter to Appellant, telling him to report on July 25. When he did not report on that date, Ford sent another letter directing Appellant to report on August 1. Because he did not report on August 1, Ford prepared a motion to adjudicate Appellant's guilt. The trial court did not grant the motion but instead permitted Appellant to remain on community supervision. The trial court instructed Appellant to report on September 20, 2013. Appellant complied, reporting on that date.

Appellant was also required to report to the sex-offender unit on September 27, but he failed to report on that date. Ford left a voice message for Appellant and sent a letter to him, instructing him to report on October 3.

Ford received a phone call from Appellant on September 30. Appellant told her that he had forgotten to report on September 27. Appellant also told Ford that he had an appointment on October 3 with the Houston Police Department to complete his sex-offender registration. Ford told Appellant to keep that appointment and to disregard her letter instructing him to report to her on October 3. She told him to instead report to her on October 4.

4

Ford testified that when she met with Appellant on October 4, "I went over all of his conditions of probation with him and I explained each condition to him and he stated he understood all the conditions, but he wasn't going to do any of them, because we were just trying to violate him." Ford testified. "[Appellant] didn't say he didn't understand [the conditions]. He just said he wasn't going to do anything because he felt like we were trying to set him up." Appellant told Ford that he thought that the State "had it good" with the trial court judge and that the judge would revoke his community supervision if the State simply asked. Ford indicated that Appellant was "well aware" of what he was saying when he stated that he was planning not to comply with the conditions.

Ford testified that, during the October 4 meeting, Appellant repeatedly said, "Mama, come and get me." Ford asked Appellant what he meant by this remark, and Appellant told her that he wanted to move back to New Orleans to live with his mother. Ford told Appellant that she would determine whether his case could be transferred to New Orleans. To do this, Ford told Appellant that she would need his mother's address.

Ford also referred Appellant to the Greater Houston Psychological Institute for a sex-offender evaluation and for a mental health evaluation. Ford indicated that, despite the referral, Appellant made no apparent effort to have the evaluations.

Ford next met with Appellant on October 10, 2013. Throughout the meeting, Appellant said that he wanted to return home to New Orleans to live with his mother. Ford again told Appellant that she needed his mother's address to facilitate the transfer of his community supervision to New Orleans, but Appellant said he did not know the address. During this visit, Appellant also admitted that he had accessed the Internet, which was a violation of the conditions of his community supervision.

Appellant next met with Ford on October 16. Appellant advised Ford that his mother no longer wanted him to live with her.

Appellant did not report to Ford on the next scheduled report date of October 23. Ford called the contact numbers provided by Appellant. Ford also sent a letter to Appellant, instructing him to report on October 30. Appellant called Ford on October 29, and left a message for her. In the message, Appellant apologized for missing his appointment, and he asked Ford to call him. However, Appellant did not leave a contact number at which Ford could reach him. Appellant did not report to Ford on October 30, as instructed. Ford sent Appellant a letter, instructing him to report to her on November 12; however, Appellant failed to report on that date, too. Ford called Appellant's contact numbers, some of which were disconnected. She sent him another letter, instructing him to report to her on November 25.

On November 20, Appellant called Ford. He told her that he had been kidnapped. Ford asked Appellant whether he had reported the kidnapping to the authorities. Ford requested Appellant "to come in and report" to her and asked him his location; however, Appellant would not provide information to Ford and did not report to Ford. After the November 20 phone call, Ford did not hear from Appellant again.

Ford also testified about additional violations of the conditions of Appellant's community supervision. She stated that Appellant did not participate in sex-offender treatment, as required. A check of the Appellant's address, where he claimed to reside, revealed that his home was closer than 1,000 feet to a pool and a playground where children might gather. This was a violation of the child safety zone restriction found in the conditions of his community supervision. In addition, Appellant had not posted a sign on the door of his home warning that children were not permitted to enter his residence; this was another condition of his community supervision.

Ford testified that she had explained all of these conditions to Appellant at the October 4 meeting. She stated that Appellant "seemed to understand" the conditions. Ford testified that Appellant never indicated that he did not understand the conditions. Ford stated that Appellant had told her that "he wasn't going to do anything because he felt like we were trying to set him up."

On cross-examination, Ford acknowledged that there are "different options available to people placed on community supervision," including transferring the community supervision to another county or state, where the probationer has a better support network and better chance of success. Another option is to place the probationer on the "mental health caseload," described at the hearing as being "a mental health oriented probation" that is "designed towards realizing that a person with a mental health issue needs a little more help than a regular probationer." At the hearing, it was undisputed that, at the time he was initially placed on community supervision, neither the community supervision officers nor the the trial court had been aware that Appellant may have mental health issues or that he may want his community supervision transferred to New Orleans.

Ford acknowledged that Appellant told her he had received social security income "for schizophrenia, AD/HD, bipolar, everything." She testified that Appellant could have been transferred to the mental health caseload "but we needed his diagnosis in writing and I had asked him to provide medical paperwork, but he [said] he had lost all of his paperwork." She stated that was why she referred him for a mental health evaluation, which he never attended.

When the State filed the motion to adjudicate Appellant's guilt, defense counsel requested the trial court to order a psychiatric examination of Appellant to determine whether he was competent to stand trial. The trial court granted the

8

motion. Psychologist Dr. Jon'Vile Brown examined Appellant to determine whether Appellant was competent to stand trial. The defense called Dr. Brown to testify at the adjudication hearing, and the trial court also took judicial notice of Dr. Brown's written competency evaluation contained in the clerk's record. In the written evaluation, Dr. Brown had determined that Appellant was competent to stand trial.

At the hearing, Dr. Brown agreed that "a person can have mental health issues and still be competent." Dr. Brown's report, and his testimony, which tracked his report, indicated that Appellant had some mental health issues.

Dr. Brown testified that he met with Appellant on September 30, 2014. At the meeting, Appellant was cooperative but irritable. Appellant told Dr. Brown that he was frustrated and angry because "he knew he wasn't going home," and Appellant "didn't think his lawyer was fighting for him." Dr. Brown described Appellant's thought process as "tangential," meaning Appellant was "jumping from topic to topic" as he spoke. Dr. Brown also wrote in his report that Appellant's speech was simplistic and child-like in tone.

In making his competency evaluation, Dr. Brown obtained background information regarding Appellant. With regard to education, Dr. Brown learned that Appellant had been enrolled in special education classes while growing up in New Orleans. Appellant had obtained a ninth or tenth grade education.

Twenty-eight-year-old Appellant told Dr. Brown that he had never been employed but had received social security disability income after he sustained a gunshot wound to the head. Appellant told Dr. Brown that he had previously been diagnosed with bipolar disorder and had a number of psychiatric hospitalizations in New Orleans. Appellant also told Dr. Brown that he had a history of alcohol and cannabis use.

In addition to meeting with Appellant, Dr. Brown obtained Appellant's medical records from the Mental Health and Mental Retardation Authority (MHMRA). Those records indicated that Appellant was first referred to MHMRA in 2010 for a psychiatric assessment when he was incarcerated for another offense. The 2010 records indicated that Appellant reported a history of bipolar disorder, depression, and auditory hallucinations.

Dr. Brown also reviewed Appellant's medical records from the Harris County Jail. Appellant had been placed in jail after his arrest in New Orleans, following the State's filing of the instant motion to adjudicate. The jail's medical records indicated that Appellant was seen by medical staff on May 19, 2014. Appellant reported having a seizure disorder, but the disorder could not be confirmed. Dr. Brown noted that the physician who saw Appellant suspected "malingering."

Dr. Brown's report states the jail records indicated Appellant was seen for a psychiatric assessment. The records indicated that Appellant had "poor grooming" and was "uncooperative." Appellant reported that he had been diagnosed with bipolar disorder in Louisiana but denied any depression or hallucinations. Dr. Brown's report stated that the records indicated that Appellant was diagnosed with "Mood Disorder Not Otherwise Specified." Dr. Brown noted that Appellant was prescribed a psychoactive medication and "ordered to be transferred to general population housing, indicating that the examining psychiatrist observed the defendant to be stable and not in need of specialized mental health housing."

The jail medical records also indicated that Appellant was seen for a follow-up assessment on May 29, 2014. Appellant was cooperative and reported that he had a history of "bipolar disorder, depression, and ADHD." Appellant also stated that he had in the past participated in inpatient and outpatient psychiatric treatment. Dr. Brown noted that the records indicated that Appellant's "mental status was reportedly intact, as was evidenced by coherent thought processes, alert consciousness, productive speech, and appropriate emotions." Dr. Brown also noted that Appellant "denied experiences of auditory hallucinations, paranoid ideation, or thoughts of harming himself or others."

The records showed that Appellant was seen again by MHMRA on August 11, 2014, following "a deputy referral," which indicated that Appellant was

"talking to himself."  Dr. Brown's report states that Appellant reported to MHMRA "that he is facing 45 years [in prison] and stated that he is experiencing depressed mood, daily visual hallucinations of his deceased son, and insomnia." Appellant also indicated at the appointment that his medication was causing him to shake.  Dr. Brown stated in his competency evaluation that the medical records showed that, "[d]espite reporting daily visual hallucinations, the [MHMRA] examiner did not observe overt behaviors indicative of psychosis, and the defendant's mental status was reportedly intact."  Dr. Brown wrote, "The examiner noted that the defendant 'appears to demonstrate some possible manipulation.'"

Dr. Brown further indicated that Appellant was seen for "mental health medication monitoring appointment" on August 15, 2014.  Appellant reported that he was not taking his medication because it did not work and made him shake. Appellant "reported auditory hallucinations," specifically that he was hearing "the voice of Chucky."  Appellant was also paranoid, "believing others are out to get him," and exhibited a "depressed mood."

Appellant had a follow-up at MHMRA on September 5, 2014.  In his report, Dr. Brown stated that the medical records showed that Appellant "continued to report auditory and visual hallucinations (seeing and hearing a 'Chucky Doll') instructing him to hurt those who have hurt him."  Appellant stated that he was not

taking his medication "because he is waiting to stand trial and wants to be deemed incompetent and believes that not taking medications will work in his favor."

In his competency evaluation, Dr. Brown wrote: "Based on clinical interview, observation, and review of available medical records, it is the opinion of this examiner that the defendant has symptoms consistent with diagnoses of Mood Disorder Not Otherwise Specified (per history), Personality Disorder Not Otherwise Specified (NOS), Cannabis Abuse, Alcohol Abuse, and Borderline Intellectual Functioning." At the adjudication hearing, Dr. Brown explained that "borderline intellectual functioning" means that Appellant does not "fall into the category of an intellectual disability, which used to be known as mental retardation, but there are some questions about his cognitive abilities."

Dr. Brown also determined in his evaluation that Appellant understood the charges against him and "the consequences associated with the plea options." He found that Appellant's "psychiatric condition does not presently impair his ability to engage with counsel in a reasonable and rational manner." Dr. Brown concluded: "In this examiner's opinion, the defendant's presentation, including information gathered from records and observation, does not overcome the presumption of competency at this time."

At the adjudication hearing, Appellant also offered the testimony of his mother, Yvette Banks. She testified that Appellant was shot in the head when he

was 13 years old. Banks indicated that Appellant has been hospitalized for mental health issues a number of times. She testified that Appellant has a "childlike mind" and does not understand the consequences of his actions.

During closing arguments, the defense requested the trial court to reinstate Appellant on deferred adjudication community supervision on a mental health caseload. The defense acknowledged that neither the trial court nor the State knew of Appellant's mental health issues when he was initially placed on deferred adjudication community supervision. The defense claimed that, given his mental health issues, Appellant had no chance of succeeding on community supervision without the additional support of being placed on a mental health caseload. Appellant asserted that the evidence showed that he had made some effort to comply with the conditions of his community supervision, but given his mental health issues, he was unable to fully comply. The defense asserted that Appellant would be able to succeed on community supervision if the trial court would place him on a mental health caseload.

In its closing argument, the State requested the trial court to adjudicate Appellant's guilt. The State averred that Appellant was not a good candidate for community supervision. The State asserted that the evidence showed that Appellant had never taken community supervision seriously. The State pointed out that Appellant had been made aware of the conditions of his community

14

supervision "multiple times." In addition, the State pointed out that, even on a mental health caseload, Appellant would still need to report and to take his medication. Appellant had demonstrated that he would not comply with such conditions. The State also called attention to Ford's testimony that she had given Appellant a psychiatric referral, but he had not taken advantage of the referral. The State concluded by requesting the trial court to sentence Appellant to 35 years in prison.

At the end of the hearing, the trial court stated:

> Having considered the testimony and evidence presented by both sides in this case, I find that the State has proved by a preponderance of the evidence that you did violate the terms and conditions of your probation. As a result of that I find you guilty at this time of aggravated sexual assault of a child and I will sentence you to 14 years in the Texas Department of Corrections.

This appeal followed.

## Adjudication of Guilt

In his sole issue, Appellant asserts that the trial court abused its discretion by adjudicating him guilty.

### A.    Standard of Review & Applicable Law

A trial court's determination on a motion to adjudicate is reviewable in the same manner as a determination of a motion to revoke community supervision. TEX. CODE CRIM. PROC. ANN. art. 42.12, § 5(b) (Vernon Supp. 2015). A revocation proceeding is neither criminal nor civil in nature; rather, it is an

15

administrative proceeding. *Canseco v. State*, 199 S.W.3d 437, 438 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). At a revocation hearing, the State must prove by a preponderance of the evidence that the defendant has violated a condition of his community supervision. *Id.* at 438. The State satisfies its burden if the greater weight of credible evidence creates a reasonable belief that the defendant violated a condition of his probation as alleged by the State. *Solis v. State*, 589 S.W.2d 444, 447 (Tex. Crim. App. 1979); *Armstrong v. State*, 82 S.W.3d 444, 448 (Tex. App.—Austin 2002, pet. ref'd). Proof of a single violation is sufficient to support a revocation. *Canseco*, 199 S.W.3d at 439.

Our review of an order adjudicating guilt and revoking community supervision is limited to determining whether the trial court abused its discretion in determining that the defendant violated the terms of his community supervision. *See Rickels v. State*, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006); *Duncan v. State*, 321 S.W.3d 53, 56–57 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). We view the evidence in the light most favorable to the trial court's order. *See Garrett v. State*, 619 S.W.2d 172, 174 (Tex. Crim. App. 1981); *Canseco*, 199 S.W.3d at 439. As the trier of fact at a revocation proceeding, the trial court determines the credibility of the witnesses and the weight to be given to their testimony. *Garrett*, 619 S.W.2d at 174; *Armstrong*, 82 S.W.3d at 448.

**B.    Analysis**

Appellant asserts that the trial court abused its discretion by adjudicating him guilty because "he was unable to satisfactorily comply with his conditions of community supervision due to an inability to fully comprehend the consequences of such failure due to his diminished mental acuity." Appellant avers that the trial court should have "first provid[ed] [him] with alternative dispositions that take into account his limitations." Specifically, Appellant claims that, instead of adjudicating him guilty, the trial court should have allowed him to continue on community supervision and either placed him on a mental health caseload or transferred his community supervision to New Orleans "where Appellant had a support system that could assist him."

Appellant indicates that his "mental health deficiencies were made known to the probation department . . . while he was still on probation." To support this assertion, Appellant points out that he indicated to Ford that he "believed that his probation would be revoked regardless of his participation" and that he told Ford "that the judicial system was against him in a way that would never permit him to succeed." Appellant also points out that he told Ford that he was receiving social security income for "schizophrenia, AD/HD, bipolar, everything." He cites Ford's testimony in which she stated that, at one meeting, Appellant repeatedly stated, "Mama, come and get me" because he wanted to live in New Orleans.

17

Appellant fails to acknowledge, however, that the evidence showed that Ford took steps to facilitate Appellant's transfer to the mental health caseload. Ford testified that she referred Appellant to the Greater Houston Psychological Institute for a mental health evaluation. She also asked Appellant to provide her with documentation showing that he had been previously diagnosed with a mental illness. Ford testified that Appellant never reported for the mental health evaluation for which she had referred him, and he never provided her with documentation to confirm his previous mental-illness diagnosis.

In this regard, Ford testified:

> If we have the proper documentation he could have probably been put on the mental health caseload, but we needed his diagnosis in writing and I had asked him to provide medical paperwork, but he say he had lost all of his paperwork. That's why I was impressing upon him to get that evaluation done with Greater Houston Psychological Institute, so we could have gotten it in writing and probably put him on a mental health caseload if warranted.

Similarly, Ford requested Appellant, on a couple of occasions, to provide him with the address of his mother in New Orleans. Ford testified that his case could not be transferred without him providing an address. Appellant never provided her with his mother's address or any other address to facilitate the transfer of his community supervision to another location.

In addition, as pointed out by the State in its closing argument, even if he were transferred to a mental health caseload, Appellant would need to comply with

reporting and treatment requirements. Here, the record shows that Appellant was not amenable to treatment and at times refused to take his psychiatric medications. The trial court, in its discretion, may have determined that transferring Appellant to a mental health caseload or to another jurisdiction would be futile, given his history.

Appellant also points out that the trial court heard evidence indicating that he suffers from mental deficiencies. In his brief, Appellant points to the following evidence admitted at the adjudication hearing:

1. Appellant's speech was simplistic and childlike in tone.

2. Appellant did not believe his attorney was fighting for him and[,] he suffered from a decrease in appetite and sleep and an increase in sadness.

3. Appellant reported visual and auditory hallucinations.

4. Appellant completed the ninth or tenth grade in New Orleans, Louisiana before withdrawing from school.

5. While in school, Appellant was registered in special education classes.

6. Appellant never received a G.E.D.

7. Appellant previously suffered a gunshot wound to the head.

8. Appellant had never been employed.

9. While in New Orleans, Appellant had a history of being diagnosed with bipolar disorder and had multiple psychiatric hospitalizations.

10. Appellant's [MHMRA] records[,] which predated 2013.

11. In February 2010, Appellant received a psychiatric assessment and reported a history of bipolar disorder as well as auditory hallucinations and depression.

12. On May 19, 2014, a psychiatrist indicated that Appellant had poor grooming, irritable mood, was uncooperative, and indicated that he received a bipolar and schizophrenia psychiatric diagnosis in Louisiana.

13. At some point in his life, Appellant had been prescribed Depakote, which is a psychiatric medication.

14. On August 11, 2014[,] Appellant was talking to himself, refusing to obey orders, and reported visual hallucinations of a deceased son and insomnia.

15. On August 15, 2014[,] Appellant said that his medication was not working.

16. Appellant had auditory hallucinations, paranoia, poor grooming, poor insight, poor eye contact, depressed mood, circumstantial thought process, and was diagnosed as borderline intellectual functioning.

Even given Appellant's past history of mental health issues, the record did not require the trial court to reinstate his community supervision and place him on a mental health caseload. Evidence was presented that raised a question with regard to whether Appellant was exaggerating his mental deficiencies or intentionally sabotaging the treatment of his mental illness. Dr. Brown reported that Appellant's jail medical records indicated that Appellant had intentionally refused to take his psychiatric medication. Appellant indicated that he believed that not taking medications would "work in his favor" by helping him to be deemed incompetent and thereby avoiding a guilty finding. Appellant's medical

records also indicated that the MHMRA examiner thought that Appellant demonstrated "possible manipulation."

Moreover, evidence of Appellant's mental deficiencies did not necessarily show that he was unable to understand the conditions of his community supervision or to comprehend the consequences of noncompliance. To the contrary, Appellant demonstrated his understanding of the reporting requirement because he reported to Ford on some of the required dates. In addition, Ford testified that Appellant left her a message on October 29 in which he apologized for missing the October 23 meeting, providing some indication that Appellant knew it was wrong to miss the meeting.

Furthermore, Scurry and Ford testified that the conditions of Appellant's community supervision were explained to him. They testified that they believed Appellant understood the conditions. Ford also testified that Appellant indicated to her that he did not intend on complying with the conditions. She testified that Appellant was "well aware" of what he was saying when he stated that he was planning not to comply with the conditions.

We acknowledge that Appellant's mother, Yvette Banks, testified that Appellant did not understand the consequences of his actions. However, as the fact finder at a hearing on a motion to adjudicate guilt, the trial court was the exclusive judge of the credibility of the witnesses. *See Canseco*, 199 S.W.3d at 439. It was

therefore within the sole province of the trial court to consider Banks's testimony and evaluate her credibility. Accordingly, the trial court was free to believe or to disbelieve all or part of Banks's testimony. *See id.*

Lastly, we note that Appellant relies on *In re J.B.*, No. 02–06–00396–CV, 2007 WL 2331023, at *2 (Tex. App.—Fort Worth Aug. 16, 2007, no pet.) (mem. op.). In that case, the trial court revoked a juvenile's probation and committed him to the Texas Youth Commission. *Id.* at *1. On appeal, J.B. argued that the evidence showed he "did not have the capacity to understand the probation order or to violate its conditions knowingly or willfully" because he suffered from mental illness. *Id.* at *2.

> Upholding the trial court's revocation order, the appellate court determined:
>
> While there was evidence that J.B. had been diagnosed with bipolar disorder and that his doctors changed his medication doses several times while he was in [a treatment program], there was no evidence that these circumstances caused J.B. to be unable to comprehend the order or how his conduct would violate it. There was, however, evidence showing the opposite-that J.B. did understand what was expected of him: Juan Lajara, J.B.'s intake probation officer, testified that when he reviewed the terms and conditions of probation with J.B. and J.B.'s mother, J.B. did not appear to have any problems understanding what Lajara was talking about because J.B. was able to explain the terms and conditions back to Lajara after Lajara initially presented them.

*Id.*

In his brief, Appellant asserts that this case is different from the foregoing case because, "[w]hereas J.B. understood the terms of his probation, Appellant's

22

actions and statements clearly demonstrate that his understanding was severely lacking." We disagree.

As discussed, Ford and Scurry both testified that the conditions of the community supervision were read to Appellant several times. The written terms and conditions of the community supervision were signed by Appellant and admitted into evidence. Ford testified that Appellant indicated that he understood the conditions and never indicated that he did not understand them. Instead, Appellant indicated to Ford that he would not comply with the conditions. In addition, Appellant demonstrated his understanding of the conditions by his partial compliance with them. Thus, *In re J.B.* does not undermine the trial court's adjudication in this case; rather, it supports it. *See id.*; *see also See Sadler v. State*, No. 08–12–00203–CR, 2014 WL 3887963, at *2–3 (Tex. App.—El Paso Aug. 8, 2014, no pet.) (not designated for publication) (rejecting defendant's claim that he did not comprehend his community supervision conditions because he lacked mental competence; court noted that defendant complied with some of the conditions, thereby indicating his ability to understand and abide by those conditions).

Viewing the evidence in the light most favorable to the trial court's ruling, as we must, we conclude that the trial court reasonably could have determined that the State proved, by a preponderance of the evidence, that Appellant violated at

least one of the conditions of his community supervision. *See Canseco*, 199 S.W.3d at 438. We hold that the trial court did not abuse its discretion in revoking Appellant's community supervision and adjudicating Appellant's guilt. *See Rickels*, 202 S.W.3d at 763.

We overrule Appellant's sole issue.

## Conclusion

We affirm the judgment of the trial court.


Laura Carter Higley
Justice

Panel consists of Justices Higley, Huddle, and Lloyd.

Do not publish. TEX. R. APP. P. 47.2(b).